# EXHIBIT A

FILED
2016 FEB 29 PM 2: 33
TIMOTHY BROWN
CLERK

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| The Bank of New York Mellon Trust Company, National Association, as Grantor Trustee of the Protium Master Grantor Trust | ) ) ) ) | No. 09 CH 19100 |
| Plaintiff | ) ) | |
| v. | ) ) ) | Property Address: 700 Lincoln Street Glenview, IL 60025 |
| Bogdan Obniski; Krystyna Obniski; JPMorgan Chase Bank, N.A.; Unknown Owners and Non-Record Claimants | ) ) ) ) | |
| Defendants | ) ) | Calendar 62 |
| ------------------------------------------------- | ) | |
| Bogdan Obniski and Krystyna Obniski | ) ) | |
| Counter-Plaintiffs | ) ) | |
| v. | ) ) ) | |
| The Bank of New York Mellon Trust Company, National Association, as Grantor Trustee of the Protium Master Grantor Trust | ) ) ) ) ) | |
| Counter-Defendants | ) ) | |
| ------------------------------------------------- | ) | |
| Bogdan Obniski and Krystyna Obniski | ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) ) | |
| Roundpoint Mortgage Servicing Corporation, a Florida Corporation and Great American E&S Insurance Company, a Delaware Corporation | ) ) ) ) | |
| Third-Party Defendants | ) ) | |

## COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

NOW COME the Counter-Plaintiffs, BOGDAN OBNISKI and KRYSTYNA OBNISKI

(hereinafter "OBNISKIS") and complaining of the Counter-Defendant The Bank of New York

Mellon Trust Company, National Association, as Grantor Trustee of the Protium Master Grantor Trust (hereinafter "BONY"), Third-Party Defendant Roundpoint Mortgage Servicing Corporation, a Florida Corporation (hereinafter "Roundpoint"), and Third-Party Defendant Great American E&S Insurance Company (hereinafter "GAESIC"), a Delaware Corporation, and state and allege as follows:

## INTRODUCTION

1.     On November 10, 2010, *American Banker* published an article describing major mortgage lenders' and servicers' questionable and often illegal practices related to force-placed insurance. The article revealed for the first time the exceptionally profitable exclusive relationships, collusive activities, and circular arrangements among the mortgage lenders and servicers, their affiliates, and their cooperating insurers.

2.     Lenders and Loan Servicers force place insurance when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on property that secures a loan. Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" a new policy on the property and then charge the premiums to the borrower. The OBNISKIS do not challenge the practice of force-placing insurance, but rather the manner in which Counter-Defendant and Third-Party Defendants exercise their power to force place insurance under borrowers' mortgages and the law.

3.     The arrangements revealed by *American Banker* comprise an extremely lucrative profit-making scheme that yields the major mortgage lenders and servicers and their selected insurers hundreds of millions of dollars annually. These companies and their affiliates enter into exclusive relationships with the major mortgage lenders and loan servicers to provide the policies. To maintain their exclusive relationships with these lenders and loan servicers, the

insurers pay unearned "kickbacks" of a percentage of the force-placed insurance premiums ultimately charged to the borrower, offer them subsidized administrative services, and/or enter into lucrative captive reinsurance deals with them.

4.     The money to finance the forced-place insurance schemes comes from unsuspecting borrowers, such as the OBNISKIS herein, who are charged inflated force-placed insurance premiums by the Lender, the Loan Servicer, or both.

5.     BONY's, Roundpoint's and GAESIC's force-placed insurance scheme takes advantage of the broad discretion afforded the lenders and/or LOAN servicers in the Mortgage contract.

6.     The OBNISKIS' Mortgage contract requires them to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.

7.     If a homeowner's hazard or flood policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

8.     Although force-placed insurance is designed to protect the lender's interest in the property that secures the loan and thus should not exceed that interest, lenders often purchase coverage from their exclusive insurers in excess of that required to cover their own risk, which is what occurred in this case.

9.     BONY has colluded with Roundpoint and GAESIC to manipulate the force-placed insurance market and artificially inflate the premiums charged to consumers, resulting in premiums up to *ten times* greater than those available to the consumer in the open market.

10.     BONY's, Roundpoint's and GAESIC's self-dealing and collusion in the force-placed insurance market has caused substantial harm to the OBNISKIS.

11.   This action seeks to recover all improper costs that the OBNISKIS have incurred related to the forced placement of hazard insurance on the subject Property by BONY, Roundpoint and GAESIC, as well as an award of punitive damages against BONY, Roundpoint and GAESIC to prevent such abuses moving forward

## PARTIES

### The OBNISKIS (Counter-Plaintiffs)

12.   The Counter-Plaintiffs, the OBNISKIS, are residents of the State of Illinois presently residing at 700 Lincoln Street, Glenview, Illinois 60025 (hereinafter "Property"). They are natural persons over the age of 18.

### BONY (Counter-Defendant)

13.   Counter Defendant BONY is a National Association which maintains its Certificate with the Office of the Comptroller of the Currency ("OCC") at Los Angeles, California. BONY is the owner of the OBNISKIS mortgage loan and the current Note Holder. BONY does business throughout the State of Illinois and is the owner of numerous residential and commercial mortgage loans throughout this State.

### Roundpoint (Third-Party Defendant)

14.   Third-Party Defendant Roundpoint is a Florida Corporation with its principal place of business located 5032 Parkway Plaza Blvd., Charlotte, NC 28217. Roundpoint is the Loan Servicer of the OBNISKIS mortgage loan. Roundpoint is authorized to transact business in Illinois and, in fact, does business throughout this State. Roundpoint is the Loan Servicer of numerous residential mortgage loans throughout this State.

### GAESIC (Third-Party Defendant)

15.     Third-Party Defendant GAESIC is a Delaware Corporation with its statutory home office located at The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801. The main administrative office of GAESIC is located at 301 East Fourth Street, Cincinnati, Ohio 45202. On information and belief, GAESIC does business within the State of Illinois and acts as the exclusive insurer for mortgage owned by BONY and serviced by Roundpoint

### JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over the OBNISKIS Counterclaims and Third-Party Claims against BONY, Roundpoint and GAESIC as Illinois Courts are Courts of general subject matter jurisdiction. *See Belleville Toyota v. Toyota Motor Sales, U.S.A.*, 199 Ill. 2d 325, 770 N.E.2d 177 (2002) ("Simply stated, 'subject matter jurisdiction' refers to the power of a court to hear and determine cases of the general class to which the proceeding in question belongs." *People v. Western Tire Auto Stores, Inc.*, 32 Ill. 2d 527, 530, 207 N.E.2d 474 (1965); *Van Dam v. Van Dam*, 21 Ill. 2d 212, 216, 171 N.E.2d 594 (1961); 14 Ill. L. & Prac. Courts § 16, at 183 (1968). "With the exception of the circuit court's power to review administrative action, which is conferred by statute, a circuit court's subject matter jurisdiction is conferred entirely by our state constitution." Ill. Const. 1970; art. VI, § 9; *In re Lawrence M.*, 172 Ill. 2d 523, 529, 219 Ill. Dec. 32, 670 N.E.2d 710 (1996); *In re M.M.*, 156 Ill. 2d 53, 65, 189 Ill. Dec. 1, 619 N.E.2d 702 (1993). "Under section 9 of article VI, that jurisdiction extends to all 'justiciable matters.'" Ill. Const. 1970, art. VI, § 9. "Thus, in order to invoke the subject matter jurisdiction of the circuit court, a plaintiff's case, as framed by the complaint or petition, must present a justiciable matter.")

17. This Court has either original jurisdiction or concurrent jurisdiction over each and every claim asserted by the OBNISKIS.

18. Furthermore, this Court has personal jurisdiction over BONY as it filed its Complaint against the OBNISKIS in the Circuit Court of Cook County, Illinois (Case No. 09-CH-19109), which remains pending.

19. This Court has personal jurisdiction over the OBNISKIS as they voluntarily submitted themselves to the jurisdiction of this Court by filing an Appearance, through counsel, in the underlying foreclosure case (Case No. 09-CH-19109).

20. This Court can obtain personal jurisdiction over Third-Party Defendants. Roundpoint and GAESIC as both are amenable to jurisdiction in this State as both Third-Party Defendants are doing business in this State.

21. Venue is also proper in Cook County, Illinois as all of the transgressions which the OBINKSIS complain of took place in Cook County, Illinois. Moreover, the OBINKSIS reside in Cook County, Illinois and BONY, Roundpoint and GAESIC are doing business in Cook County, Illinois. Finally, the Property which is the subject of the underlying foreclosure case and all of the OBNISKIS claims is located in Cook County, Illinois.

## FACTS PERTAINING TO ALL COUNTS

### Introduction

22. Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower the full cost of the premium is neither a new concept nor a term undisclosed to borrowers in mortgage agreements.

23. Section 5 of the subject Mortgage provides:

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term

"extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. . . .
If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Attached hereto and incorporated herein by reference as **Exhibit 1** is a true and complete copy of

the subject Mortgage

   24. The subject Mortgage also states that "Lender may do and pay for whatever is

*reasonable or appropriate* to protect Lender's interest in the Property. *See* **Exh. 1**, ¶ 9.

   25. What is unknown to the OBNISKIS and not disclosed in the Mortgage is that

lenders and loan servicers have exclusive arrangements with certain insurers pursuant to which

the lenders, servicers, and insurers manipulate the force-placed insurance market and artificially

inflate premiums. The premiums are inflated to provide lenders and loan servicers with

kickbacks disguised as "commissions" (usually paid to an affiliate), or provide the lender or loan

servicer (through an affiliate) with lucrative reinsurance arrangements as well as to include

unmerited charges. The borrower is then forced to pay the inflated premiums.

### The Force-Placed Insurance Scheme

   26. The scheme works as follows. Lenders and mortgage loan servicers (here, BONY

and Roundpoint), purchase master or "umbrella" insurance policies that cover the entire portfolio

of mortgage loans. In exchange, GAESIC obtains the exclusive right to force-place insurance on

property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate. The insurer monitors the lender's loan portfolio for lapses in borrowers' insurance coverage. Once a lapse is identified, GAESIC sends notice to the borrower that insurance will be "purchased" and force-placed if the voluntary coverage is not continued. If a lapse continues, the insurer notifies the borrower that insurance is being force-placed at his or her expense.

27.     No individualized underwriting ever takes place for the force-placed coverage. Rather, the Counter-Defendant requires, or at least permit, the insurer to automatically place this insurance coverage when a borrower's policy lapses. This provision is located in Paragraph 5 of the Mortgage. *See* Exh. 1, ¶5.

28.     Once coverage is forced on the property, the Lender or Loan Servicer charges the borrower for the insurance premiums and automatically deducts the amount from the borrower's mortgage escrow account, or adds it to the balance of the borrower's loan.

29.     The Lender or Loan Servicer then pays the premium to the insurer who then kicks-back a set percentage of the premium to the mortgage lender's or servicer's affiliate as a "commission." The affiliate then shares a percentage of that payment with the Lender or Loan Servicer, sometimes in the form of "soft dollar" credits.

30.     The money paid back to the Lender or Loan Servicer's affiliate is not given in exchange for any services provided by the affiliate; it is simply grease paid to keep the force-placed machine moving. In an attempt to mask the kickback as legitimate, the insurer sends a disclosure to the borrower that the affiliate may receive a "commission" or "compensation" for helping the lender to procure a force-placed policy. In reality, however, no work is ever done by

the affiliate to procure insurance for that particular borrower because the coverage comes through the master or umbrella policy already in place.

31.     Under this highly profitable force-placed insurance scheme, Roundpoint is incentivized to purchase and force-place insurance policies with inflated premiums on borrowers' properties because the higher the cost of the insurance policy, the higher the kickback.

32.     GAESIC also enters into agreements with Roundpoint whereby the insurer provides servicing activities on the entire loan portfolio at below cost. The servicing costs are added into the force-placed premiums which are then passed on to the borrower. GAESIC is able to provide these services below cost because of the enormous profits it makes from the hyper-inflated premiums charged for force-placed insurance. However, because insurance-lapsed mortgaged property comprises only 1–2% of the lender or loan servicer's total mortgage portfolio, the borrowers who pay these premiums unfairly bear the entire cost to service the entire loan portfolio.

33.     In addition, force-placed insurance providers enter into essentially riskless "captive reinsurance arrangements" with lenders and their affiliates to "reinsure" the property insurance force-placed on borrower.

34.     A recent *American Banker* article detailed this reinsurance problem with respect to another Loan Servicer, JP Morgan Chase Bank, N.A.:

> JPMorgan and other mortgage servicers' reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements.
>
> Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS. Of every hundred

dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns. The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market. Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue. J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, (May18, 2012), available at http://www.americanbanker.com/issues/177_97/chase-reinsurance-dealsregulator-attack-1049460-1.html.

35.     To further complicate matters, if an insured property goes into foreclosure, the borrower is deemed no longer insurable and cannot purchase a homeowner's insurance policy as required by Section 5 of the Mortgage.

36.     The only insurance coverage that a borrower in foreclosure can purchase is contents insurance (similar to renter's insurance coverage) to cover the borrower's personal property (a Renter's Policy). This coverage does not satisfy the borrower's obligations as set forth in Paragraph 5 of the Mortgage. However, this is the borrower's only choice.

37.     As a result, the borrower is literally forced to purchase the forced place insurance. This scheme is not only immoral and unethical, it is also a part of a larger scheme by those in the insurance industry and loan servicing industries to defraud innocent consumers.

### The Specific Facts

38.     The OBNISKIS purchased the subject Property in July of 2005.

39.     Immediately thereafter, the OBNISKIS moved into the Property as their primary and principal residence.

40.     At all times since July of 2005, the OBNISKIS have resided in the Property as their primary and principal residence.

41.     At all times since they purchased the Property and were able to do so, the OBNISKIS had purchased their insurance for the Property through AllState Insurance Company (hereinafter "AllState").

42.     The OBNISKIS insurance coverage would cost between $800.00 and $1,000.00 for a one-year policy of homeowner's insurance which would satisfy their requirements under the Mortgage.

43.     On March 12, 2015, Roundpoint sent the OBNISKIS a correspondence from Roundpoint indicating that Roundpoint had purchased a one-year policy of insurance for the Property with a cost of $5,601.75 and charged the same to their mortgage account balance. Attached hereto as **Exhibit 2** is a copy of the March 12, 2015 correspondence from Roundpoint.

44.     On July 16, 2015, Roundpoint sent the OBNISKIS a correspondence from Roundpoint indicating that Roundpoint had purchased a one-year policy of insurance for the Property with a cost of $5,320.35 and charged the same to their mortgage account balance. Attached hereto as **Exhibit 3** is a copy of the July 16, 2015 correspondence from Roundpoint.

45.     Therefore, between March 12, 2015 and July 16, 2015 (less than 6 months), Roundpoint purchased insurance for the Property, a single family home, with total premiums of $10,922.10.

46.     These charges for a one-year policy of homeowner's insurance for a single family home are unjustifiable, unconscionable and patently outrageous.

47.     Even if the two policies represent coverage for 2014 and 2015, respectively, the charges are still unjustifiable, unconscionable, and outrageous and simply cannot be allowed by this Court.

48.    The OBNISKIS are informed and believe, and on this basis allege, that GAESIC kick-backed a substantial portion of the policy premiums described above to Roundpoint, the Loan Servicer.  Roundpoint, in turn, is seeking to collect a reimbursement for this outrageous premium amount from the OBNISKIS as part of its foreclosure lawsuit.

49.    The OBNISKIS are informed and believe, and on this basis allege, that their Mortgage loan and their Property were already covered by a master or umbrella insurance policy maintained by Roundpoint through GAESIC when the charges described above were added to their mortgage loan account balance.  Therefore, when Roundpoint claims it purchased insurance for their property on March 12, 2015 in the amount of $5,601.75 and on July 16, 2015 in the amount of $5,320.35, this amounted to double-coverage for the same Property and the same Mortgage loan.

50.    Such conduct is unjustifiable, unreasonable and outrageous.

51.    GAESIC knew of the practices described above and created an environment in which such fraudulent and deceptive business practices could survive and thrive.

52.    GAESIC provided the mechanism by which Roundpoint could enter into such forced-place insurance contracts with its borrowers.

53.    The actions and practices described above are unconscionable and done in bad faith with the sole objective to maximize profits. Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated and illegitimate non-competitive "premiums" for force-placed insurance that include undisclosed kickbacks Roundpoint (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of captive reinsurance arrangements and administrative services.

54.    The OBNISKIS here do not challenge the right to force place insurance in the first instance.   They challenge the manipulation of the force-placed insurance market with an eye toward artificially inflating premiums and placing unnecessary coverage, which the BONY and Roundpoint purchase from their selected insurers and then choose to pass on to the borrower. This action is brought to put an end to BONY's, Roundpoint's and GAESIC's exclusive, collusive, and uncompetitive arrangements, and to recover for OBNISKIS the excess amounts charged to them beyond the true cost of insurance coverage.

### COUNT I
### BREACH OF CONTRACT
#### (OBNISKIS against BONY and Roundpoint)

55.    The OBNISKIS incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as if full set forth herein.

56.    The OBNISKIS' Mortgage loan is owned by BONY.

57.    The OBNISKIS' Mortgage loan is serviced by Roundpoint.

58.    Section 5 of the OBNISKIS' mortgage loan sets forth the obligations and requirements with respect to force placed insurance. *See* **Exh. 1**, Section 5.

59.    The OBNISKIS' Mortgage require that they maintain insurance on the Property and provides that if they fail to do so, then the Lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the cost.

60.    Roundpoint charged the OBNISKIS premiums and continues to try to collect from the OBNISKIS individually premiums and other charges that include unearned "commissions" or kickbacks, reinsurance premiums, as well as bundled administrative and other impermissible costs.  These costs are not costs of coverage, and are not applied to protecting the BONY's rights or risk in the Property.

61.     Roundpoint breached the Mortgage agreement by, among other things, charging OBNISKIS amounts beyond the actual cost of coverage.

62.     Roundpoint also breached OBNISKIS' Mortgage agreement by charging OBNISKIS for excess and unnecessary force-placed insurance coverage, including retroactive coverage, as such coverage does not protect the Loan Servicer's rights in the Property or cover their risk.

63.     BONY breached the Mortgage contract by failing to adequately monitor the actions of its chosen Loan Servicer in the servicing of the OBNISKIS' Mortgage loan.

64.     BONY has turned a blind eye to the conduct of Roundpoint and failed to implement policies and procedures to curtail such abuses.

65.     The OBNISKIS have suffered damages as a result of BONY's and Roundpoint's breaches of contract.

66.     Specifically, BONY and Roundpoint have charged the OBNISKIS in excess of eight thousand dollars ($8,000.00) above and beyond a fair and reasonable charge for comparable insurance coverage. There is no justification for this conduct.

67.     The OBNISKIS have been forced to retain counsel to pursue these matters.

68.     WHEREFORE, the OBNISKIS pray that this Honorable Court order as follows:

(a).    That the Court award them compensatory damages resulting from BONY's and Roundpoint's breaches of contract in an amount to be proven up at a later date;

(b).    The Court issue an injunction against BONY and Roundpoint preventing them from further violating the terms of the Mortgage;

(c).    That the Court award the OBNISKIS all Court costs and reasonable attorney fees incurred by the OBNISKIS in the prosecution of this action to be proven up at a later date; AND

(d).    For such other and further relief that the Court deems just and proper.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (OBNISKIS against BONY and Roundpoint)

69.    The OBNISKIS incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as if full set forth herein.

70.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

71.    Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

72.    The OBNISKIS' Mortgage contracts allows the Note Holder, BONY, and its chosen Loan Servicer, Roundpoint, to force-place an insurance policy on their Property in the event of a lapse in coverage, but does not define standards for selecting an insurer or procuring an insurance policy.

73.    The Mortgage contract affords BONY and Roundpoint substantial discretion in force placing insurance coverage. They are permitted to unilaterally choose the company from which to purchase insurance and to negotiate a price for the coverage it procures.

74.    BONY and Roundpoint have an obligation to exercise the discretion afforded it in good faith, and not capriciously or in bad faith.

75.     The OBNISKIS do not seek to vary the express terms of the Mortgage contract, but only to insure that BONY and Roundpoint exercise their discretion in good faith.

76.     BONY and Roundpoint have breached the implied covenant of good faith and fair dealing by, among other things:

a.      Manipulating the force-placed insurance market by selecting insurers (here, GAESIC) that will artificially inflate premiums to include kickbacks to Roundpoint and issue excess insurance coverage not necessary to cover the risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from GAESIC without seeking a competitive price;

b.      Exercising their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force placed insurance policies with artificially inflated premiums to maximize their own profits;

c.      Assessing inflated and unnecessary insurance policy premiums against the OBNISKIS and misrepresenting the reason for the cost of the policies;

d.      Collecting a percentage or allowing its affiliates to collect a percentage of whatever premiums are charged to the OBNISKIS and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

e.      Charging the OBNISKIS for commissions when the insurance is prearranged and no commission is due;

f.     Charging the OBNISKIS inflated premiums due to the captive reinsurance arrangement;

g.     Charging the OBNISKIS for having the vendor perform their obligation of administering its mortgage portfolio which is not chargeable to the OBNISKIS;

h.     Force placing insurance coverage in excess of what is required by law or the OBNISKIS' Mortgage agreement; and

i.     Force placing insurance coverage in excess of that required to cover the Lender or Loan Servicer's interest in the property, or the balance owed on the loan.

77.     As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, the OBNISKIS have suffered damages.

78.     Specifically, BONY and Roundpoint have charged the OBNISKIS in excess of eight thousand dollars ($8,000.00) above and beyond a fair and reasonable charge for comparable insurance coverage.

79.     The OBNISKIS have been forced to retain counsel to pursue these matters.

WHEREFORE, the OBNISKIS pray that this Honorable Court order as follows:

(a).     That the Court enter an Order declaring that the premiums charged and the terms of the force-placed insurance policies of QBE and ASIC attached hereto violate the duties of good faith and fair dealing;

(b).     The Court a compensatory award in an amount equal to the damages incurred by the OBNISKIS and resulting from the BONY's, Roundpoint's and GAESIC' breaches of their duties of good faith and fair dealing;

(c).     That the Court award the OBNISKIS all Court costs and reasonable attorney fees incurred by the OBNISKIS in the prosecution of this action; AND

(d).    For such other and further relief that the Court deems just and proper.

## COUNT III
## UNJUST ENRICHMENT
### (OBNISKIS against BONY, Roundpoint and GAESIC)
### *(Pleading in the Alternative)*

80.    The OBNISKIS now pleading in the alternative, incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as if full set forth herein.

81.    The OBNISKIS plead their unjust enrichment claim against t BONY, Roundpoint and GAESIC in the alternative to their contractual counterclaims.

82.    BONY, Roundpoint and GAESIC received from the OBNISKIS benefits in the form of inflated insurance premiums related to force-placed insurance policies, unwarranted kickbacks and commissions, captive reinsurance arrangements, and subsidized loan servicing costs.

83.    These Defendants entered into an agreement whereby GAESIC would provide force-placed insurance policies to Roundpoint for the portfolio of loans owned by BONY. These Defendants would then charge the OBNISKIS premiums that had been artificially inflated to include costs not properly chargeable to the OBNISKIS.

84.    The force-placed policies imposed on the OBNISKIS were therefore far more expensive than those available to the OBNISKIS in the open market that provide even more coverage.

85.    Furthermore, the OBNISKIS could not have complied with the insurance requirements for the subject Mortgage because no insurance provider would sell them a homeowner's insurance policy because the Property was in foreclosure.

86.    These Defendants knew that the OBNISKIS would not be in a position to purchase insurance on their own once their Mortgage went into foreclosure.

87.    These Defendants took advantage of the OBNISKIS through their network of affiliated insurance providers to create an environment where the OBNISKIS would literally have no other option than to allow the purchase of force placed insurance because no one would sell them homeowner's insurance.

88.    These Defendants also collected premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

89.    Roundpoint and GAESIC paid and collected significant monies in premiums, kickbacks, commissions, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage). Commissions or kickbacks were paid directly to Roundpoint in order to be able to exclusively provide force-placed insurance policies. GAESIC was a mere conduit for the delivery of the kickbacks, "commissions," and other charges to Roundpoint.

90.    These payments directly benefitted the Roundpoint and GAESIC and were taken to the detriment of the OBNISKIS. The kickbacks and commissions, reinsurance arrangements, and subsidized costs were subsumed into the price of the insurance premium and ultimately paid by the OBNISKIS. Therefore, these Defendants had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

91.    BONY failed to implement adequate policies and procedures to monitor and supervise the actions of its chosen Loan Servicer, Roundpoint, and Roundpoint's chosen insurance agent, GAESIC.

92.     Further, Roundpoint and GAESIC received financial benefits in the form of increased interest income, duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause, and/or "soft-dollar" credits.

93.     As a result, the OBNISKIS and have conferred a direct benefit on these Defendants.

94.     These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

95.     These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and the OBNISKIS are therefore entitled to recover the amount by which these Defendants were unjustly enriched at their expense.

96.     WHEREFORE, the OBNISKIS pray that this Honorable Court order as follows:

(a).    That the Court enter an award in favor of the OBNISKIS and against BONY, Roundpoint and GAESIC in the amounts by which these Defendants have been unjustly enriched at OBNISKIS' expense to be proven up at a later date;

(b).    That the Court award the OBNISKIS all Court costs and reasonable attorney fees incurred by the OBNISKIS in the prosecution of this action; AND

(c).    For such other and further relief that the Court deems just and proper.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
### (OBNISKIS against Roundpoint)

97.     The OBNISKIS incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as if full set forth herein.

98.     Roundpoint holds funds in escrow on behalf of borrowers whose mortgages they service. These funds are designated for the purpose of paying insurance premiums when due.

Any excess funds are to be returned to the OBNISKIS in accordance with the express written terms of the Mortgage agreement.

99.    As such, a fiduciary relationship exists between the OBNISKIS and Roundpoint because Roundpoint has received a greater economic benefit than that taken from a typical escrow transaction.

100.    Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when Roundpoint took it upon itself to manage the OBNISKIS' escrow account and withdrew money from such escrow account to pay force-placed insurance premiums.

101.    Roundpoint violated their fiduciary duties to the OBNISKIS when it intentionally withdrew amounts beyond the cost of insurance—amounts that would cover unlawful kickbacks or other compensation under the force-placed insurance scheme described above. The kickbacks or other compensation provide Roundpoint a greater economic benefit than what was contemplated under the Mortgage.

102.    Roundpoint breached its fiduciary duties to the OBNISKIS by (1) not acting in the borrowers' best interest by profiting from force-placed insurance policies that were purchased using escrow funds held for the benefit of the OBNISKIS at the expense of the OBNISKIS, and (2) not disclosing the kickback scheme to the OBNISKIS.

103.    These actions were undertaken by Roundpoint in bad faith, were solely for its benefit, and were not intended to benefit the OBNISKIS.

104.    As a direct result of Counter-Defendant GTS's actions and subversion of the OBNISKIS' interest to its own in reaping extravagant and outrageous fees, the OBNISKIS have suffered injury in the form of unnecessary and excessive escrow charges and a loss of funds from their escrow accounts.

WHEREFORE, the OBNISKIS pray that this Honorable Court order as follows:

(a).     That the Court enter an award in favor of the OBNISKIS and against the Counter-Defendant for its breach of its fiduciary duties to the OBNISKIS, in an amount to be proven up at a later date;

(b).     That the Court award the OBNISKIS punitive damages because Counter-Defendant GTS acted in bad faith in deliberate or reckless disregard of their rights and of its obligation to hold the OBNISKIS' escrow funds in trust;

(c).     That the Court award the OBNISKIS all Court costs and reasonable attorney fees incurred by the OBNISKIS in the prosecution of this action; AND

(d).     For such other and further relief that the Court deems just and proper.

## COUNT V
## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (OBNISKIS against GAESIC)

105.     The OBNISKIS incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as if full set forth herein.

106.     OBNISKIS have an advantageous business and contractual relationship with BONY and Roundpoint pursuant to the Mortgage contract.

107.     The OBNISKIS have legal rights under their Mortgage contract. For example, the OBNISKIS have a right not to be charged exorbitant premiums in bad faith for forced-place insurance.

108.     GAESIC had knowledge of the Mortgage and the advantageous business and contractual relationships between OBNISKIS and BONY and Roundpoint.

109.     GAESIC is not party to the Mortgage contracts and is not a third-party beneficiary of the Mortgage contract.

110.   Further, GAESIC has no beneficial or economic interest in the Mortgage contract.

111.   GAESIC intentionally and unjustifiably interfered with OBNISKIS' rights under their Mortgage contract, as described above by, *inter alia*, entering into or continuing an exclusive relationship with Roundpoint, by which it provides compensation (kickbacks, reinsurance, and low-cost services) to Roundpoint in exchange for the exclusive right to force place inflated and unnecessary premiums, which it purposefully and knowingly charged to the OBNISKIS.

112.   The OBNISKIS have been damaged as a result of GAESIC's interference with their Mortgage by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention of their rights under the Mortgage.

WHEREFORE, the OBNISKIS pray that this Honorable Court order as follows

(a).   That the Court enter an award in favor of the OBNISKIS and against GAESIC for the actual damages suffered by the OBNISKIS as a result of GAESIC's tortious interference with the Counter-Plaintiff's Mortgage contract;

(b).   That the Court award the OBNISKIS all Court costs and reasonable attorney fees incurred by the OBNISKIS in the prosecution of this action; AND

(c).   For such other and further relief that the Court deems just and proper.

## COUNT VI
### Violation of Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. § 1962(c)
### (OBNISKIS against BONY, Roundpoint and GAESIC)

113.   The OBNISKIS incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as if full set forth herein.

114.   At all relevant times, BONY, Roundpoint and GAESIC were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs,

through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

115. The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that include BONY, Roundpoint and GAESIC.

116. The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing OBNISKIS to pay unreasonably high premiums for force placed insurance through a scheme that inflated such premiums to cover kickbacks and expenses associated with monitoring the Roundpoint and BONY entire loan portfolio.

117. These Defendants shared the bounty of their enterprise, i.e., by sharing the premiums generated by the joint scheme.

118. The RICO enterprise functioned over a period of years as a continuing unit and had maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

119. BONY, Roundpoint and GAESIC all conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

120. Specifically, BONY, Roundpoint and GAESIC used the mail for the purposes of defrauding the OBNISKIS over a period that lasted more than one year and on more than one occasion. *See* Exh. 2 and Exh. 3.

121.    As part of and in furtherance of the scheme to defraud, these Defendants made numerous material omissions and misrepresentations to OBNISKIS with the intent to defraud and deceive the OBNISKIS.  For example, GAESIC with the approval of Roundpoint, sent form letters to the OBNISKIS, stating that Roundpoint would purchase and GAESIC would place insurance if voluntary insurance was not secured by a certain date. It was represented in these letters that Roundpoint would purchase the required coverage and charge the borrower for the "cost" of the insurance coverage.  The letters also specified an amount for the "cost of Lender Placed Insurance" chargeable to the borrower. In making these statements, these Defendants knowingly and intentionally fostered the mistaken impression that the force-placed insurance premiums that OBNISKIS were charged represented the "cost" of the policies, when in fact such premiums also included kickbacks returned to Roundpoint.

122.    These Defendants had a duty to correct this mistaken impression.

123.    The omission was material, as it gave these Defendants a colorable reason to charge the OBNISKIS unreasonably high premiums and would have influenced the OBNISKIS' decisions whether to pay the premiums or contest them.

124.    The OBNISKIS received at least two such letters. *See* **Exh. 2** and **Exh. 3**.

125.    The OBNISKIS have every reason to believe that the amounts stated in *Exh. 2* and **Exh. 3** were, in fact, charged to their mortgage loan and/or mortgage escrow account.

126.    All of the aforementioned letters warned that if new or additional coverage was purchase or placed, coverage would be placed and that Roundpoint "may receive" a commission for obtaining the coverage. This disclosure misleads borrowers in several respects. First, Roundpoint did not do any work to assist with the procurement of force-placed insurance. Second, the payment made to the Loan Servicer in connection with the force-placed insurance

program was not a true "commission" or "compensation" because it was not consideration for any work performed. These letters omitted to disclose that the payment was in fact a kickback to the Loan Servicer.

127.    For the purpose of executing the scheme to defraud, BONY, Roundpoint and GAESIC sent, mailed and transmitted, or caused to be sent, mailed or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing OBNISKIS that they could charge OBNISKIS unreasonably high force-placed insurance premiums.

128.    BONY, Roundpoint and GAESIC also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud OBNISKIS, in violation of the wire fraud statutes.

129.    By reason and as a result of foregoing conduct and participation in the racketeering activity alleged herein, BONY, Roundpoint and GAESIC have caused damages to OBNISKIS in the form of unreasonably high force-placed insurance premiums

WHEREFORE, the OBNISKIS pray that this Honorable Court order as follows:

(a).    That the Court enter an award in favor of the OBNISKIS and against BONY, Roundpoint and GAESIC for compensatory and treble damages, pursuant to 18 U.S.C. § 1964(c) in an amount to be proven at a later date;

(b).    That the Court award the OBNISKIS all Court costs and reasonable attorney fees incurred by the OBNISKIS in the prosecution of this action; AND

(c).    For such other and further relief that the Court deems just and proper.

### COUNT VII
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**18 U.S.C. § 1962(c)**
**(OBNISKIS against BONY, Roundpoint and GAESIC)**

130.    The OBNISKIS incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as if full set forth herein.

131.    ICFA, 815 ILCS § 505, *et seq.*, is a regulatory and remedial statute intended to protect consumers, borrowers, and businessman against fraud, unfair methods of competition, and other unfair and deceptive business practices.

132.    ICFA prohibits false, deceptive, misleading and unfair acts or practices, "including but not limited to the use or employment of any deception, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact." 815 ILCS § 505/2.

133.    ICFA provides redress not only for deceptive business practices but also for practices that are unfair.

134.    A business practice is unfair if it offends public policy, or if it is immoral, unethical, oppressive or unscrupulous and if it causes substantial injury to consumers.

135.    BONY, Roundpoint and GAESIC in their force placed insurance scheme made false representations of material facts to OBNISKIS in that these Defendants claimed the OBNISKIS' property was not insured when in fact it was covered by a master or umbrella insurance policy, that the cost of the insurance policy was the actual cost of the policy when in fact it included exorbitant kickbacks and other "commissions" and "compensation" not related to the service provided, any work performed or any insurance product.

136.    BONY, Roundpoint and GAESIC employed deception, false pretense, misrepresentation and used unfair and deceptive practices when it made the representations set forth hereinabove.

137.    These actions occurred in the course of conduct involving trade or commerce under 815 ILCS § 505/2.

138.    BONY, Roundpoint and GAESIC knew that the OBNISKIS were relying on their false, unfair and deceptive representations regarding its forced place insurance scheme.

139.    BONY, Roundpoint and GAESIC intended that the OBNISKIS rely on its false, unfair and deceptive representations regarding its necessity to place insurance on the Property and the cost of that insurance policy.

140.    The unfair and deceptive and knowingly false representations were material.

141.    In addition to being deceptive, BONY's, Roundpoint's and GAESIC's conduct and business practices regarding its force placed insurance scheme were unethical, immoral, oppressive, and have caused substantial injury to consumers, violate public policy, and are patently unfair, in violation of ICFA.

142.    In particular, BONY, Roundpoint and GAESIC have engaged in knowingly false, misleading and deceptive communications with the OBNISKIS whereby they represented to OBNISKIS that the Property was not insured, that they did not have insurance for the Property under a master insurance policy, that artificially inflated the cost of the insurance policy, and that failed to disclose the true nature of the insurance arrangement between Roundpoint and GAESIC whereby most of the premium would be kick-backed to Roundpoint for allowing GAESIC to place force placed insurance on the Property.

143.    BONY's, Roundpoint's and GAESIC's conduct offends public policy and violates ICFA.

144.    The OBNISKIS were damaged as a proximate result of BONY's, Roundpoint's and GAESIC's unfair, fraudulent, misleading and deceptive conduct, in violation of ICFA.

145. Each of these Defendant's deceptive acts, misrepresentations, omissions and unfair acts violates the express terms of ICFA.

WHEREFORE, the OBNISKIS pray that this Honorable Court orders as follows:

(a). That the Court award compensatory damages to the OBNISKIS, including prejudgment interest and attorneys' fees and costs;

(b). That the Court award the OBNISKIS all Court costs and reasonable attorney fees incurred by the OBNISKIS in the prosecution of this action;

(c). That the Court award the OBNISKIS punitive damages on account of the BONY's, Roundpoint's and GAESIC's reckless disregard for consumer protection laws; AND

(d). For such other and further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The OBNISKIS demand a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted,

BOGDAN OBNISKI and
KRYSTYNA OBNISKI

By: _____
Arthur C. Czaja
Attorney for Defendants, Counter-Plaintiffs
and Plaintiffs in the Third-Party Action

Arthur C. Czaja
Attorney for Defendants, Counter-Plaintiffs and
Plaintiff in the Third-Party Action
Cook County Attorney #47671
7521 N. Milwaukee Avenue
Niles, IL 60714
Telephone: (847) 647-2106
Facsimile: (847) 647-2057
Email: arthur@czajalawoffices.com

EXHIBIT A

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING

P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
SLADJANA RIZVANOVICH

AMERICA'S WHOLESALE LENDER

1011 WARRENVILLE RD. #115
LISLE
IL 60532

----

[Space Above This Line For Recording Data]

.3190                                    00016489641803007

[Escrow/Closing #]                       [Doc ID #]

# MORTGAGE

. MIN 1001337-0002065286-6

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated MARCH 16, 2007 , together with all Riders to this document.

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 16

 -6A(IL) (0010).02    CHL (08/05)(d)   VMP Mortgage Solutions, Inc. (800)521-7291          Form 3014 1/01
CONV/VA



EXHIBIT
1

DOC ID #: 0001648964180300**7**

**(B)** "Borrower" is

BOGDAN OBNISKI, AND KRYSTYNA OBNISKI, HUSBAND AND WIFE, AS TENANTS BY THE ENTIRETY

Borrower is the mortgagor under this Security Instrument.
**(C)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D)** "Lender" is
Countrywide Bank, FSB.
Lender is a FED SVGS BANK
organized and existing under the laws of THE UNITED STATES
Lender's address is
1199 North Fairfax St. Ste.500, Alexandria, VA 22314
**(E)** "Note" means the promissory note signed by Borrower and dated   MARCH 16, 2007           . The
Note states that Borrower owes Lender
SEVEN HUNDRED FIFTEEN THOUSAND and 00/100

Dollars (U.S. $ 715,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   APRIL 01, 2037     .
**(F)** "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)** "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H)** "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(I)** "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J)** "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(K)** "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L)** "Escrow Items" means those items that are described in Section 3.
**(M)** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)

DOC ID #: 0001648964180300700

damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

COUNTY               of               COOK
[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number:                                    which currently has the address of
                    700 LINCOLN STREET, GLENVIEW
                              [Street/City]

Illinois    60025    ("Property Address"):
            [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

@ -6A(IL) (0010).02    CHL (08/05)          Page 3 of 16                    Form 3014 1/01

DOC ID #: 00016489641803007

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

DOC ID #: 00016489641803007

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

DOC ID #: 00016489641803007

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

DOC ID #: 0001648964180300.7

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

DOC ID #: 00016489641803007

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or, (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a

DOC ID #: 00016489641803007

condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

DOC ID #: 00016489641803007

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

DOC ID #: 00016489641803007

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

DOC ID #: 0001648964180300?

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

DOC ID #: 0001648961803007

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:
22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall

DOC ID #: 0001648964180300

further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Homestead. In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. Placement of Collateral Protection Insurance. Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

DOC ID #: 00016489641803007

further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Homestead. In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. Placement of Collateral Protection Insurance. Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

DOC ID #: 0001648964180300 7

further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Homestead. In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. Placement of Collateral Protection Insurance. Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

DOC ID #: 0001648964180B007

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.

_Bogdan Obniski_         (Seal)
BOGDAN OBNISKI              -Borrower

_Krystyna Obniski_         (Seal)
KRYSTYNA OBNISKI           -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

STATE OF ILLINOIS, *Luda Polonsky*

DOC ID #: 0001648964180300?

County ss:

I, _____, a Notary Public in and for said county

and state do hereby certify that _____

*Bogdan Obniski*

*Krystyna Obniski*

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument,
appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said
instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this 16 day of *March 02*

My Commission Expires: 01/29/11

Notary Public

OFFICIAL SEAL
LUDA POLONSKY
Notary Public – State of Illinois
My Commission Expires Jan 29, 2011

File No.: STC-3190

# EXHIBIT A

PIN:    04-35-317-004-0000

LOT 56 IN WYATT AND COONS COUNTRY PLACE, UNIT NO. 2, BEING A SUBDIVISION IN THE
SOUTHWEST QUARTER (1/4) OF SECTION 35, TOWNSHIP 42 NORTH, RANGE 12, EAST OF THE THIRD
PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, ACCORDING TO PLAT THEREOF REGISTERED
MAY 11, 1945, AS DOCUMENT NUMBER 1051756.

RoundPoint Mortgage Servicing Corporation
P.O. Box 39575
Solon, OH 44139-0575



**ROUNDPOINT**
MORTGAGE SERVICING CORPORATION

03/12/2015

BOGDAN OBNISKI
KRYSTYNA OBNISKI
700 LINCOLN ST
GLENVIEW, IL 60025

**Loan Number:** [redacted]

**Location of Collateral:**
700 LINCOLN ST, GLENVIEW, IL 60025

RE: NOTICE OF HAZARD/FIRE/REAL PROPERTY INSURANCE REQUIREMENT AND FORCE PLACEMENT

Dear BOGDAN OBNISKI, KRYSTYNA OBNISKI:

Thank you for being a customer of RoundPoint Mortgage Servicing Corporation. Our records indicate you have not provided us with evidence of continuous Hazard/Fire/Real Property insurance coverage on the above referenced property. In order to protect our security interest in the property, we have ordered the enclosed insurance coverage.

This insurance policy provides physical damage coverage to the building only and excludes coverage for loss due to flood or earthquake or supplemental coverage, such as theft, liability or contents. You should know that the insurance limits in this policy might not be sufficient to fully restore the property in the event of a total loss. Nothing set forth in this letter is or should be deemed to be a promise or obligation on us to purchase or maintain such insurance. You are responsible for repaying your loan in the event a loss is incurred and you have not obtained insurance. Any insurance proceeds we receive from a policy we purchase on your behalf will be applied in accordance with the provisions of your loan and mortgage.

As a result of the lapse in coverage on your property, a premium charge of $5,601.75 has been added to your loan to cover the cost of the insurance coverage in the amount of $624,000.00. Please be advised that our licensed affiliate insurance agency may receive a commission for placing this insurance. If this is unacceptable to you, we urge you to provide us with a policy that you prefer. Once we receive acceptable proof of coverage, we will cancel our coverage. If there is a lapse in your insurance coverage, you will be charged a daily pro-rata premium.

Please have your agent provide a copy of your Hazard/Fire/Real Property insurance policy or reinstatement reflecting the loan number and property address shown above. In addition, please list the correct mortgagee clause, effective dates and coverage amounts. The mortgagee clause on your policy must read as follows:

RoundPoint Mortgage Servicing Corporation
Its Successors and/or Assigns (ISAOA)
As their interest may appear (ATIMA)
P.O. Box 39575
Solon, OH 44139-0575

Please forward a copy of this letter to your insurance agent requesting they promptly comply with our requirements on your behalf and fax the necessary documentation to us at 440-505-2007 or mail to the address shown above.

Please call us at 866-881-2568 if you have any questions regarding this letter or the insurance requirement on your mortgage loan. We are here to answer your questions Monday through Friday, 8:00 am to 8:00 pm EST and Saturday, 8:00am to 12:00pm EST.

Thank you for allowing RoundPoint Mortgage Servicing Corporation to serve your needs. We look forward to hearing from you.

Sincerely,

Insurance Department

EXHIBIT
2

RMS-COVER-9218D758

ROUNDPOINT MORTGAGE SERVICING CORPORATION IS A MORTGAGE SERVICER, AND DOES ACT AS A DEBT COLL[...] INFORMATION OBTAINED MAY BE USED TO COLLECT A DEBT. TO THE EXTENT YOUR OBLIGATION HAS BEEN DISCH[...] TO THE AUTOMATIC STAY IN A BANKRUPTCY PROCEEDING, THIS NOTICE IS FOR INFORMATION PURPOSES ONLY AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT OR AN ATTEMPT TO COLLECT AN INDEBTEDNESS AS YOUR PERSONAL OBLIGATION. IF YOU ARE [...] PLEASE PROVIDE US WITH THE ATTORNEY'S NAME, ADDRESS AND TELEPHONE NUMBER.

Attention Illinois Property Owner(s):

NOTICE OF PLACEMENT OF INSURANCE

Your credit agreement with us requires you to maintain adequate insurance on your collateral until you pay off your loan. You have not given us proof that you have adequate insurance on your collateral. Under the terms of your credit agreement, we have purchased insurance at your expense to protect our interests in your collateral.

The insurance we purchased will pay claims made by us as the creditor. The insurance we purchased may not pay any claims made by you or against you in connection with your collateral.

You are responsible for the costs of this insurance, including any interest and other charges that we may impose in connection with the purchase of this insurance. The initial premium payment for this insurance will be $5,601.75, which may or may not include any interest or other charges that we may impose. The costs of this insurance will be added to your payment obligations and may be more than for insurance you can buy on your own.

You still may obtain insurance of your own choosing on the collateral. If you provide us with proof that you have obtained adequate insurance on your collateral, we will cancel the insurance that we purchased and refund or credit any unearned premiums to you.

If, within 30 days after the date this notice was sent to you, you provide us with proof that you had adequate insurance on your collateral as of the date we also purchased insurance and that you continue to have the insurance that you purchased yourself, we will cancel the insurance that we purchased without charging you any costs, interest, or other charges in connection with the insurance that we purchased.

RoundPoint Mortgage Servicing Corp (ISAOA) (ATIMA)
P.O. Box 39575
Solon, OH 44139-0575


**ROUNDPOINT**
MORTGAGE SERVICING CORPORATION

07/16/2015

BOGDAN OBNISKI
KRYSTYNA OBNISKI
700 LINCOLN ST
GLENVIEW, IL 60025

**Loan Number:**    **Location of Collateral:**
    700 LINCOLN ST, GLENVIEW, IL 60025

**RE: NOTICE OF HAZARD/FIRE/REAL PROPERTY INSURANCE REQUIREMENT AND FORCE PLACEMENT**

Dear BOGDAN OBNISKI, KRYSTYNA OBNISKI:

Thank you for being a customer of RoundPoint Mortgage Servicing Corporation. Our records indicate you have not provided us with evidence of continuous Hazard/Fire/Real Property insurance coverage on the above referenced property. In order to protect our security interest in the property, we have ordered the enclosed insurance coverage.

This insurance policy provides physical damage coverage to the building only and excludes coverage for loss due to flood or earthquake or supplemental coverage, such as theft, liability or contents. You should know that the insurance limits in this policy might not be sufficient to fully restore the property in the event of a total loss. Nothing set forth in this letter is or should be deemed to be a promise or obligation on us to purchase or maintain such insurance. You are responsible for repaying your loan in the event a loss is incurred and you have not obtained insurance. Any insurance proceeds we receive from a policy we purchase on your behalf will be applied in accordance with the provisions of your loan and mortgage.

As a result of the lapse in coverage on your property, a premium charge of $5,320.35 has been added to your loan to cover the cost of the insurance coverage in the amount of $624,000.00. Please be advised that our licensed affiliate insurance agency may receive a commission for placing this insurance. If this is unacceptable to you, we urge you to provide us with a policy that you prefer. Once we receive acceptable proof of coverage, we will cancel our coverage. If there is a lapse in your insurance coverage, you will be charged a daily pro-rata premium.

Please have your agent provide a copy of your Hazard/Fire/Real Property insurance policy or reinstatement reflecting the loan number and property address shown above. In addition, please list the correct mortgagee clause, effective dates and coverage amounts. The mortgagee clause on your policy must read as follows:

    RoundPoint Mortgage Servicing Corporation
    Its Successors and/or Assigns (ISAOA)
    As their interest may appear (ATIMA)
    P.O. Box 39575
    Solon, OH 44139-0575

Please forward a copy of this letter to your insurance agent requesting they promptly comply with our requirements on your behalf and fax the necessary documentation to us at 440-505-2007 or mail to the address shown above.

Please call us at 866-881-2568 if you have any questions regarding this letter or the insurance requirement on your mortgage loan. We are here to answer your questions Monday through Friday, 8:00 am to 8:00 pm EST and Saturday, 8:00am to 12:00pm EST.

Thank you for allowing RoundPoint Mortgage Servicing Corporation to serve your needs. We look forward to hearing from you.

Sincerely,

Insurance Department

EXHIBIT
**3**

RMS-COVER-103422484

ROUNDPOINT MORTGAGE SERVICING CORPORATION IS A MORTGAGE SERVICER, AND DOES ACT AS A DEBT COLLEC___
INFORMATION OBTAINED MAY BE USED TO COLLECT A DEBT. TO THE EXTENT YOUR OBLIGATION HAS BEEN DISCHARGED OR IS SUBJECT
TO THE AUTOMATIC STAY IN A BANKRUPTCY PROCEEDING, THIS NOTICE IS FOR INFORMATION PURPOSES ONLY AND DOES NOT
CONSTITUTE A DEMAND FOR PAYMENT OR AN ATTEMPT TO COLLECT AN INDEBTEDNESS AS YOUR PERSONAL OBLIGATION. IF YOU ARE
REPRESENTED BY AN ATTORNEY, PLEASE PROVIDE US WITH THE ATTORNEY'S NAME, ADDRESS AND TELEPHONE NUMBER.

Attention Illinois Property Owner(s):

NOTICE OF PLACEMENT OF INSURANCE

Your credit agreement with us requires you to maintain adequate insurance on your collateral until you pay off your loan. You have not given us proof that you have adequate insurance on your collateral. Under the terms of your credit agreement, we have purchased insurance at your expense to protect our interests in your collateral.

The insurance we purchased will pay claims made by us as the creditor. The insurance we purchased may not pay any claims made by you or against you in connection with your collateral. ... ........ ..........

You are responsible for the costs of this insurance, including any interest and other charges that we may impose in connection with the purchase of this insurance. The initial premium payment for this insurance will be $5,320.35, which may or may not include any interest or other charges that we may impose. The costs of this insurance will be added to your payment obligations and may be more than for insurance you can buy on your own.

You still may obtain insurance of your own choosing on the collateral. If you provide us with proof that you have obtained adequate insurance on your collateral, we will cancel the insurance that we purchased and refund or credit any unearned premiums to you.

If, within 30 days after the date this notice was sent to you, you provide us with proof that you had adequate insurance on your collateral as of the date we also purchased insurance and that you continue to have the insurance that you purchased yourself, we will cancel the insurance that we purchased without charging you any costs, interest, or other charges in connection with the insurance that we purchased.